PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Plaintiff,

v.

ARCADIAN CORPORATION, Hydro Agri North America, Inc., Dyno Nobel Inc. f/k/a Ireco Incorporated, et al., Defendants.

No. 96–CIV. 1635(WGB).

United States District Court, D. New Jersey.

Dec. 19, 1997.

McGuire & Wachenfeld, Newark, NJ, Samuel Pace, Jennifer Gallagher, Dugan, Brinkmann, Maginnis & Pace, Philadelphia, PA, for Plaintiff Port Authority of New York and New Jersey.

Richard S. Shapiro, Hellring Lindeman Goldstein & Siegal, Newark, NJ, Phillip T. Bruns, Gibbs & Bruns, L.L.P., Houston, TX, for Defendant Arcadian Corp.

Andrew T. Berry, McCarter & English, Newark, NJ, John T. Montgomery, Ropes & Gray, Boston, MA, for Defendant Hydro Agri North America, Inc.

Glenn A. Clark, Riker, Danzig, Scherer, Hyland & Perreti, Morristown, NJ, for Defendant Dyno Nobel Inc.

## OPINION

BASSLER, District Judge.

On February 26, 1993, terrorists detonated an explosive device (the "Device") under the World Trade Center, killing six, injuring many, and causing massive property damage. Alleging that the terrorists used Defendants' fertilizer products to construct the Device, Plaintiff Port Authority of New York and New Jersey, the owner of the World Trade Center, seeks to recover damages from Defendants on theories of negligence and products liability.

Defendants now move to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). The Court's jurisdiction is pursuant to 28 U.S.C. § 1332 (diversity). For the following reasons, the Court **grants** Defendants' motion.

## I. BACKGROUND

### A. The Parties

#### 1. *Plaintiff*

Plaintiff is a body corporate and politic created and regulated by agreement between New York and New Jersey. (Amended Complaint ¶ 1.)

#### 2. *Defendant Arcadian Corporation ("Arcadian")*

Arcadian is incorporated in Delaware, with its principal place of business in Memphis,

William B. McGuire, Marianne Espinosa Murphy, George G. Campion, Tompkins,

Tennessee. (*Id.* ¶ 2.) Plaintiff alleges that Arcadian is in the business of designing, manufacturing, marketing, distributing, and/or selling nitrogen chemicals and fertilizers, including urea prills [1] that are used as fertilizer. (*Id.*) Arcadian allegedly designed, manufactured, marketed, distributed, and/or sold the urea prills used by the terrorists to construct the Device. (*Id.* ¶ 17.)

### 3. *Defendant Dyno Nobel, Inc., f/k/a Ireco, Inc. ("Dyno")*

Dyno's state of incorporation is Delaware and its principal place of business is Salt Lake City, Utah. (*Id.* ¶ 4.) Plaintiff alleges that Dyno is engaged in the business of designing, manufacturing, marketing, distributing, and/or selling ammonium nitrate slurry and nitroglycerin-based explosives, as well as agricultural chemicals and fertilizers, including ammonium nitrate prills used as fertilizer. (*Id.*) Dyno allegedly designed, manufactured, marketed, distributed, and/or sold the ammonium nitrate allegedly used by the terrorists to construct the Device. (*Id.*)

### 4. *Defendant Hydro Agri North America, Inc. ("HANA")*

HANA is incorporated in the state of Florida, with its principal place of business in Tampa, Florida. (*Id.* ¶ 5.) Plaintiff alleges that HANA's business is the designing, manufacturing, marketing, distributing, and/or selling of agricultural chemicals and fertilizers, including ammonium nitrate prills used as fertilizer. (*Id.*) Hanna allegedly manufactured, designed, marketed, distributed, and/or sold the ammonium nitrate used to construct the Device. (*Id.*)

### B. The Construction of the Device

In order to construct the Device, the terrorists allegedly purchased Defendants' ammonium nitrate and urea. (*Id.* ¶ 24, 27.) The terrorists purchased these products in New Jersey. (*Id.* ¶ 18.) The terrorists allegedly purchased these products in prill form for use as fertilizer. (*Id.* ¶¶ 2, 4, 5, 23, 26.) Plaintiff alleges that Defendants' products were rendered explosive by mixing them

with other substances such as fuel oil, "sensitizing substances," water, and/or nitric acid. (*Id.* ¶¶ 22, 23, 26.) The terrorists allegedly added fuel oil or other sensitizing substances to the ammonium nitrate, (*id.* ¶ 23,) and nitric acid and water to the urea. (*Id.* ¶ 26.) Notably, Plaintiff never alleges that Defendants' products were explosive in and of themselves without alteration or combination with these other substances.

Plaintiff alleges that the assembly of the Device then occurred in New Jersey by New Jersey residents. (*Id.* ¶¶ 19–20.) After the required assembly, the terrorists allegedly transported the Device from New Jersey to the World Trade Center using a vehicle rented in New Jersey. (*Id.* ¶ 21.)

Plaintiff also alleges that Defendants knew or should have known of the explosive capability of their products. (*Id.* ¶¶ 25, 28). Plaintiff asserts that two infamous explosions occurred in the United States involving fertilizer. Fifty years ago, two ships, the S.S. Grandcamp and the S.S. High Flyer, are alleged to have been destroyed while docked at Texas City, Texas by explosions when fire spread to their ammonium nitrate cargoes. (*Id.* ¶ 39.) In addition to the loss of the two ships, 468 people died in that tragic event. (*Id.*)

The second incident occurring in this country was an alleged act of terrorism involving the use of a fertilizer bomb. In 1970, anti-Vietnam War protesters used ammonium nitrate to bomb the Mathematics Research Building at the University of Wisconsin. (*Id.* ¶ 40.) The explosion caused deaths, injuries, and property damage.

Plaintiff alleges that in response to the University of Wisconsin bombing, several states introduced legislation that would have required ammonium fertilizers to be desensitized to reduce if not eliminate the risk that the fertilizer could be turned into an explosive. (*Id.* ¶ 41.) Plaintiff alleges that this legislation received substantial publicity without and within the fertilizer industry. (*Id.*) After alleged resistance by various fer-

---

1. A prill is a round, hardened droplet approximately the size of the tip of a ball point pen. (*Id.* ¶ 23, 26.)

tilizer manufacturers, however, the legislation failed. (*Id.*)

Plaintiff also alleges that the use of fertilizer as an explosive was not simply a national problem, but an international one. In the early 1970s, Plaintiff alleges that there were terrorist bombings in Northern Ireland and the Republic of Ireland involving devices made from fertilizer. (*Id.* ¶ 46.) Additionally, explosives made from nitrated urea prills were allegedly used by terrorists in the Middle East, South America, and Pakistan. Finally, the Shining Path terrorists allegedly extensively used ammonium nitrate fertilizer prills in explosive charges. (*Id.* ¶¶ 54–56.)

Plaintiff alleges that the widespread use of ammonium nitrate and urea in international terrorism has led to its regulation and ban elsewhere. (*Id.* ¶¶ 45, 46, 56.) As a result of the use of fertilizer bombs in Northern Ireland and the Republic of Ireland, those countries allegedly limited the amount of nitrate that could be used in fertilizer products and required the addition of calcium, sulfates, and other substances to reduce their detonability. (*Id.* ¶ 46.) As a result of the Shining Path terrorists' activities, Peru is alleged to have imposed an outright ban on the sale of urea and ammonium nitrate fertilizers in 1992. (*Id.* ¶ 56.) Moreover, in 1975, the European Community Council allegedly issued strict standards regarding detonation tests and for the formulation of all solid ammonium nitrate. (*Id.* ¶ 45.) These standards could be adopted by member countries and were designed to ensure that there was an extremely low risk that fertilizer sold in countries adopting the standards could be used as an explosive. (*Id.*) As a result of these standards, France required that all ammonium nitrate fertilizers were tested by detonation. (*Id.*) Furthermore, four European nations banned the sale of certain ammonium nitrate fertilizers outright. (*Id.*)

In addition to allegations of Defendants' knowledge of the explosive capabilities of their fertilizer products, Plaintiff also alleges that Defendants knew or should have known that they could have rendered their products less dangerous, but failed to do so. (*Id.* ¶¶ 33, 34, 49, 50.) In 1968, Samuel Porter obtained a patent for a process that rendered ammonium nitrate fertilizer non-detonable. (*Id.* ¶ 36.) Porter's process involved the blending of 5–10% of diammonium phosphate, a high grade fertilizer, with ammonium nitrate. (*Id.*) This process could be accomplished at a nominal cost. (*Id.*) One of the stated purposes of the patented process was to deter the criminal use of ammonium nitrate fertilizer in bombs. (*Id.*) The patent owners made the process available to ammonium nitrate fertilizer manufacturers. (*Id.*) In 1985, the process entered the public domain and could have been used by any and all ammonium nitrate manufacturers, including Defendants, without having to pay licensing fees or royalties. Plaintiff also alleges that "the addition of phosphate or other additives to urea prills would [have] decrease[d] or eliminate[d] their use as explosive and energetic materials." (*Id.* ¶ 52.)

### C. Plaintiff's Claims

Plaintiff asserts three claims against Defendants. Count 1 states that Defendants "negligently failed to design, manufacture, market, distribute and/or sell [ammonium nitrate or urea prills] with a formulation" that would "either render them less detonable or non-detonable" or "decrease or eliminate their explosive properties." (*Id.* ¶¶ 34, 50.) Count II is based on a products liability design defect theory. (*Id.* Count II.) Specifically, Plaintiff alleges that Defendants' ammonium nitrate and urea prills were "unreasonably dangerous and defective when they left the respective control of each of the defendants" for basically the same reasons that Defendants were allegedly negligent. (*Id.* ¶¶ 63, 66.) Finally, Count III asserts a failure to warn claim. In Plaintiff's own words, Defendants "failed to provide guidelines, instructions and/or warnings to their distributors, retailers, dealers or other suppliers to confirm that buyers in the general and unrestricted public market have legitimate and lawful purposes for use of defendants' products." (*Id.* ¶ 71.)

## II. DISCUSSION

### A. Standards Governing a Rule 12(b)(6) Motion

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for a dismissal based

upon the pleader's "failure to state a claim upon which relief can be granted." Since the long-established federal policy of civil litigation is to decide cases on the proofs, district courts generally disfavor Rule 12(b)(6) motions. *Melo–Sonics Corp. v. Cropp*, 342 F.2d 856 (3d Cir.1965); *Panek v. Bogucz*, 718 F.Supp. 1228, 1229 (D.N.J.1989).

In deciding a motion to dismiss for failure to state a claim, all allegations in the pleadings must be accepted as true and the plaintiff must be given the benefit of every favorable inference that can be drawn from those allegations. *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Wisniewski v. Johns–Manville Corp.*, 812 F.2d 81, 83 n. 1 (3d Cir.1987). "All the rules require is a short and plain statement of the claim that gives the defendant fair notice of the plaintiff's claim and the grounds upon which it rests." *Conley*, 355 U.S. at 47.

▬ Rule 12(b)(6) does not countenance "dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke v. Williams*, 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled, not in relevant part, by, Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

Accepting the facts in the pleadings as true and giving them all reasonable inferences, a court must dismiss under Rule 12(b)(6) "[i]f as a matter of law 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Neitzke*, 490 U.S. at 326–27.

### B. Choice of Law

▬ Because the materiality of a factual dispute is determined by the applicable substantive law, *Anderson*, 477 U.S. at 248, the Court must generally determine as a threshold matter whether New Jersey or New York law applies. A federal court sitting in diversity determines the substantive law to be applied by looking to the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Shields v. Consolidated Rail Corp.*, 810 F.2d 397 (3d Cir. 1987).

Defendants claim that a dismissal of Plaintiff's claims is warranted under either New York or New Jersey law, the only two possible choices of law in light of the Amended Complaint. (Memorandum in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint for Failure to State a Claim ("Moving Br.") at 6 n. 3.) Defendants also suggest that since discovery has not begun it is premature to determine the applicable substantive law. (Defendants' Reply in Support of Motion to Dismiss Plaintiff's Amended Complaint for Failure to State a Claim ("Rep.Br.") at 2 n. 1.) In contrast, Plaintiff argues that New Jersey law clearly governs this dispute. (Plaintiff's Brief in Opposition to the Defendants' Rule 12(b)(6) Motion to Dismiss the Complaint ("Opp. Br.") at 8–12.)

Some New Jersey courts have held that they did not possess sufficient facts prior to discovery to make choice of law evaluations. *See, e.g., D'Agostino v. Johnson & Johnson, Inc.*, 115 N.J. 491, 497, 559 A.2d 420 (1989); *El–Maksoud v. El–Maksoud*, 237 N.J.Super. 483, 491, 568 A.2d 140 (1989). Other courts, however, have performed detailed choice of law analyses on motions to dismiss made prior to discovery. *See, e.g., Aetna Sur. & Cas. Co. v. Sacchetti*, 956 F.Supp. 1163, 1168–71 (D.N.J.1996) (Rule 12(b)(6) motion); *Yglesias v. Simmons Market Research Bureau*, No. 90–3898(CSF), 1991 WL 49744, at *2 (D.N.J. Apr.1, 1991) (same); *Mowrey v. Duriron Co., Inc.*, 260 N.J.Super. 402, 413–16, 616 A.2d 1300 (App.Div.1992) (motion to dismiss on *forum non conveniens* grounds); *see also Heavner v. Uniroyal, Inc.*, 63 N.J. 130, 135–141, 305 A.2d 412 (motion to dismiss due to expiration of the statute of limitations).

▬ Even if it is not premature to make a choice of law determination, this Court finds no need to do so because Plaintiff fails to state a claim under either New Jersey or New York law. *See Rohm and Haas Co. v. Adco Chem. Co.*, 689 F.2d 424, 429 (3d Cir. 1982) ("[When] application of the law of each

state to the facts ... leads to the same outcome.... a 'false conflict' exists, [and] New Jersey conflicts of law rules permit the resolution of the case without a choice between the laws of the two states.") (citations omitted); *Mueller by Mueller v. Parke Davis*, 252 N.J.Super. 347, 355, 599 A.2d 950 (App.Div.1991).

### C. Duty

 Defendants' first series of arguments assert that they owed no duty to prevent the alleged harms. Under both New Jersey and New York law, the existence of a duty is a question for the court. *Strachan v. John F. Kennedy Mem'l Hosp.*, 109 N.J. 523, 538 A.2d 346 ("The question of whether a duty exists is a matter of law properly decided by the court ... and is largely a question of fairness or policy."); *Purdy v. Public Adm'r*, 72 N.Y.2d 1, 530 N.Y.S.2d 513, 526 N.E.2d 4, 6–7 (1988) ("The question of whether a member or group of society owes a duty of care to reasonably avoid injury to another is of course a question of law for the courts.") (citations omitted). When no duty exists, dismissal for failure to state a claim is proper. *See Griesenbeck v. Walker*, 199 N.J.Super. 132, 141–42, 488 A.2d 1038 (App. Div.1985); *McCarthy v. Sturm, Ruger and Co., Inc.*, 916 F.Supp. 366, 369 (S.D.N.Y.1996) (applying New York law), *aff'd*, 119 F.3d 148 (2d Cir.1997).

 Under New Jersey products liability law, negligence is no longer viable as a separate claim for harm caused by a defective product. *Oquendo v. Bettcher Indus., Inc.*, 939 F.Supp. 357, 361 (D.N.J.1996) (citing N.J.S.A. § 2A:58C–1; *Tirrell v. Navistar Int'l, Inc.*, 248 N.J.Super. 390, 398, 591 A.2d 643 (App.Div.1991)). Because Plaintiff's negligence count is based on harm caused by Defendant's allegedly defective products, it falls squarely within New Jersey's Product Liability Act (the "Act"), codified at N.J.S.A. 2A:58C–1 *et seq. Oquendo*, 939 F.Supp. at 361. Therefore, Plaintiff's claim of negligence is subsumed by its products liability claims. *Id.*

 Plaintiff's remaining claims allege different theories of products liability. Thus, under New Jersey Law, the starting point for whether a duty exists must be the Act. The New Jersey Supreme Court, in *Zaza v. Marquess and Nell, Inc.*, set forth the relevant legal framework:

> Under strict products liability a manufacturer has a duty to ensure that the products it places into the stream of commerce are safe when used for their intended purposes. The focus in a strict liability case is on the product itself.
>
> . . . .
>
> The term "defect" is not self-defining and has no universally accepted meaning suitable for every strict products liability case. Defects are classified as design defects, manufacturing defects or inadequate warning defects. Generally, the emphasis in strict products liability analysis is on the safety of the product, not on the reasonableness of the manufacturer's conduct. However, under the Act, as under the common law, the ultimate question to be resolved in design-defect and failure-to-warn cases is whether the manufacturer acted in a reasonably prudent manner in designing and fabricating a product. As we [previously] observed:
>
> > When the strict liability defect consists of an improper design or warning, reasonableness of the defendant's conduct is a factor in determining liability. The question in strict liability design-defect and warning cases is whether, assuming that the manufacturer knew of the defect in the product, he acted in a reasonably prudent manner in marketing the product or in providing the warnings given. Thus, once the defendant's knowledge of the defect is imputed, strict liability analysis becomes almost identical to negligence analysis in its focus on the reasonableness of the defendant's conduct.

144 N.J. 34, 47–49, 675 A.2d 620 (1996) (citations omitted).

 Relying on *Zaza*, Defendants first argue that since their products were only components of the Device, and were substantially altered by the terrorists, they owed Plaintiff no duty with respect to the harm caused by the Device. (Moving Br. at 9–15.)

Defendants misstate New Jersey law. "New Jersey courts have held manufacturers strictly liable for products; despite another's subsequent substantial alterations, where those alterations were objectively foreseeable and likely to cause injury." *Oquendo v. Bettcher Indus., Inc.*, 939 F.Supp. 357, 362 (D.N.J. 1996) (citations omitted); *see also Brown v. United States Stove Co.*, 98 N.J. 155, 165, 484 A.2d 1234 (1984) (recognizing "that a manufacturer can also be held liable under strict liability principles for design defects if it is objectively foreseeable that a substantial change in the product will cause injury.") (citation omitted). Although the component parts manufacturer in *Zaza* did not owe a duty with respect to the finished product, the *Zaza* court specifically held that " 'when it is feasible for the rebuilder of machinery or the manufacturer of component parts to incorporate a safety device and it fails to do so, the rebuilt machine or component part will be deemed to be a defective product when delivered by the manufacturer to its owner.' " *Zaza*, 144 N.J. at 51, 675 A.2d 620 (quoting *Michalko v. Cooke Color & Chem. Corp.*, 91 N.J. 386, 395, 451 A.2d 179 (1982)).

Defendants next argue that they owed no duty to Plaintiff because their product was criminally misused. Defendants recognizes that a defendant in a products liability action is not always relieved of any liability whenever a product is misused. Defendants, however, seek to make a distinction between using a product for an improper purpose and using a product for a proper purpose, but in an improper manner. (Moving Br. at 16–21.) Defendants argue that New Jersey courts only recognize liability of a manufacturer in the second situation. (*Id.* at 17.)

Defendants are clearly mistaken. The New Jersey Supreme Court has clearly indicated that using a product for an improper purpose *or* in an improper manner will not relieve a manufacturer of liability where that improper purpose or manner is objectively foreseeable. *Jurado v. Western Gear Works*, 131 N.J. 375, 386, 619 A.2d 1312 (1993). While the New Jersey Supreme Court has recognized the distinction between the two types of misuses, *see id.*, liability may clearly attach for either. *Id.* at 386–88, 619 A.2d

1312. Therefore, regardless of the type of misuse, a defendant may also be strictly liable for a product that was misused, if the misuse was objectively foreseeable. *Jurado*, 131 N.J. at 385–86, 619 A.2d 1312 (1993).

Although Defendants attempt to separate these issues of alteration and criminal misuse into two separate justifications for dismissal, they are more appropriately treated together. "[T]he foreseeable misuse of a product that proximately causes injury is analogous to a foreseeable subsequent alteration of the product, and generates the same legal consequences in terms of strict products liability." *Brown*, 98 N.J. at 169, 484 A.2d 1234; *accord Soler v. Castmaster, Div. of H.P.M. Corp.*, 98 N.J. 137, 151, 484 A.2d 1225 (1984). "Thus, in the event of either a substantial alteration or misuse, the manufacturer will be responsible for resultant injuries to an operator if the alteration or misuse implicated in the actual use of the machine was foreseeable and could have been prevented or reduced by the manufacturer." *Soler*, 98 N.J. at 151, 484 A.2d 1225; *see also Jurado*, 131 N.J. at 385–86, 619 A.2d 1312 ("Hence, the plaintiff in a design-defect products liability suit may succeed even if the product was misused, as long as the misuse or alteration was objectively foreseeable.").

Accordingly, although the misuse of Defendants' products may have involved criminal acts of others, substantial alteration, and use for an improper purpose, Defendants are not necessarily excused from liability if Plaintiff alleges facts that would justify a finding that the terrorists' alterations and misuse of Defendants' product were objectively foreseeable. *See Oquendo*, 939 F.Supp. at 362; *Jurado*, 131 N.J. at 385–86, 619 A.2d 1312.

Nonetheless, Defendants are still entitled to dismissal because the alterations and misuse of Defendants' fertilizer products were not objectively foreseeable.

Objective foreseeability means reasonable foreseeability. *The standard "does not affix responsibility for future events that are only theoretically, remotely, or just possibly foreseeable, or even simply subjectively foreseen by a particular manufacturer."* *Brown*, 98 N.J. at 168, 484 A.2d 1234 ....

Rather it "applies to those future occurrences that, in light of the general experience within the industry when the product was manufactured, objectively and reasonably could have been anticipated." *Id.;* *see also [McDermott v. TENDUN Constructors,* 211 N.J.Super. 196, 211–12, 511 A.2d 690 (App.Div.1986)] (similarly requiring objective, reasonable foreseeability).

*Oquendo,* 939 F.Supp. at 362; *see also Jensen v. Schooley's Mountain Inn, Inc.,* 216 N.J.Super. 79, 81, 522 A.2d 1043 (App.Div. 1987) ("The existence of a duty to exercise reasonable care is determined by whether or not the risk or event to be guarded against is reasonably within the range of apprehension of injury to another person.") (quoting *Hill v. Yaskin,* 75 N.J. 139, 144, 380 A.2d 1107 (1977)).

The Court finds, as a matter of law, that the World Trade Center bombing was not reasonably or objectively foreseeable. Plaintiff argues that issues of reasonableness and foreseeability should be left for a jury to decide. The Court recognizes that these issues are generally a matter to be determined by a jury. *See Soler,* 98 N.J. at 154, 484 A.2d 1225. However, a Court may resolve such issues as a matter of law where "the inferences are so clear that a court can say as a matter of law that a reasonable manufacturer could not have foreseen the change." *Id.* (quoting parenthetically *Merriweather v. E.W. Bliss Co.,* 636 F.2d 42, 45 (3d Cir.1980) (quoting *D'Antona v. Hampton Grinding Wheel Co.,* 225 Pa.Super. 120, 125, 310 A.2d 307 (1973))).

New Jersey courts have not hesitated to hold that no duty existed as a matter of law in cases involving rare and unlikely circumstances. In *Taylor by Wurgaft v. General Elec. Co.,* 208 N.J.Super. 207, 211, 505 A.2d 190 (App.Div.1986), minor plaintiffs were injured when gasoline vapors from spilled gasoline were ignited by an exposed intermittent electric spark ignition system in their parents' clothes dryer. The plaintiffs' parents had used a Clorox bottle to store gasoline on the basement steps near the dryer. *Id.* For unknown reasons, the Clorox bottle had fallen, the cap came loose and fell off, and the gasoline spilled down the stairs and spread towards the dryer. *Id.* at 212, 505 A.2d 190. The plaintiffs alleged that the defendant gas company was negligent "in failing to warn its customers that they should not store gasoline where it might spill near a gas-fired appliance with an exposed electrical ignition system." *Id.* The court "reject[ed] that theory as groundless," stating that "[t]he duty to warn enforceable in tort law against the manufacturer and distributor of a product should not extend to a duty to warn of negligence or other liability of a third party." *Id.* at 212–13, 505 A.2d 190. The court further held that the "[d]anger of fire or explosion as a proximate result of a third-party's actionable fault, even if conceivable as a possibility by [the gas company], was not as a matter of law reasonably foreseeable by [the gas company.]" *Id.* at 213, 505 A.2d 190. Therefore, the Appellate Division affirmed the trial court's granting of the gas company's motion for summary judgment. *Id.* at 215, 505 A.2d 190.

The *Taylor* court also granted summary judgment with respect to The Clorox Company. The parties asserting claims against Clorox stated that Clorox "had a duty to warn against reuse of its empty bottle to store gasoline because of a reasonably foreseeable danger of spillage and an ensuing fire or explosion." *Id.* at 213, 505 A.2d 190. "That duty [allegedly] arose from the shape and convenient handle of the plastic Clorox bottle[s] lending themselves to and inducing reuse, together with a pattern of reuse common in past experience." *Id.* In addition, the parties against Clorox asserted that Clorox assumed a duty when it provided the cautionary label: "Do not use this bottle for storage of any liquid except Clorox." *Id.* The court held, as a matter of law, that the use of the Clorox bottle in the manner that resulted in the accident was unforeseeable as a matter of law. *Id.* at 214, 505 A.2d 190.

Furthermore, in *Griesenbeck by Kuttner v. Walker,* defendants' daughter visited the defendants at their home. 199 N.J.Super. 132, 135, 488 A.2d 1038 (App.Div.1985). The defendants served their daughter two drinks despite the fact that she was obviously intoxicated. *Id.* The daughter then returned to her home and fell asleep on her sofa with a

lit cigarette. *Id.* The sofa caught fire, the house caught fire, and the daughter, her husband, and one of their two children were killed in the fire. *Id.* The second child was seriously injured. *Id.* Suit was filed on behalf of the surviving child and the estate of the deceased child. *Id.* The plaintiffs brought the action on the theory that the defendants negligently served alcohol to the daughter.

The *Griesenbeck* court found that the defendants owed no duty to plaintiffs because the harm was not foreseeable as a matter of law. Although the court recognized that social hosts had a duty not to serve an obviously intoxicated guest and will thereafter be liable for resulting harm caused by drunk driving, the court refused to extend defendants' duty to cover such extraordinary circumstances. *Id.* at 136–39, 488 A.2d 1038; *cf. Littlehale v. E. I. du Pont De Nemours & Co.*, 380 F.2d 274, 276 (2d Cir.1967) (per curiam) ("[T]here was no duty to provide a more detailed warning than had been given because the undisputed facts revealed that, as a matter of law, du Pont could not have foreseen that its detonators, manufactured specifically for use by highly trained Ordnance personnel to detonate 'Composition C.' would in fact be utilized 13 years later by a civilian employee of the Navy to detonate a TNT grenade. Or, to state it differently, as a matter of law du Pont, under the circumstances of this case, could not have foreseen that its detonators would be used by a person untrained in the handling of such explosives and in a manner that was never intended.") (citations omitted) (footnote omitted).

 Plaintiff's allegations regarding past fertilizer explosions, as a matter of law, simply do not permit a finding of objective foreseeability. An almost identical argument has previously been rejected. In *Gaines–Tabb v. ICI Explosives USA, Inc.*, No. CIV–95–719–R, ── F.Supp. ── [1996 WL 937899] (W.D.Ok. July 2, 1996), the plaintiffs sued the alleged manufacturers of the fertilizer used in the Oklahoma City bombing. The defendant's product was misbranded as fertilizer grade ammonium nitrate, but was actually explosive grade. In discussing proximate causation, the Court noted:

Plaintiffs have made numerous allegations from which it can reasonably be inferred that the possibility that criminals or terrorists might employ [ammonium nitrate fertilizer] to make an explosive or bomb and attempt to detonate it somewhere in the United States. But the Court agrees with Defendant ICI that this is not the level of foreseeability which would permit a finding that the acts of the persons or persons who bombed the Murrah Building were reasonably foreseeable to Defendant. . . .

*Id.* at ──. Thus, even though the Oklahoma City bombing occurred after the World Trade Center bombing, the *Gaines–Tabb* court found the event unforeseeable as a matter of law. Similarly, although Plaintiff's allegations show that the theoretical possibility certainly existed, Plaintiff has failed to set forth sufficient allegations that would permit a finding that it was *reasonably* foreseeable that such an incident would occur from the use of Defendants' products.

Compare *Brogan Cadillac–Oldsmobile Corp. v. Central Jersey Bank and Trust Co.*, in which the defendant bank's blank check had been stolen from its vault. 183 N.J.Super. 333, 334–35, 443 A.2d 1108 (Law Div. 1981), *aff'd*, 190 N.J.Super. 500, 464 A.2d 1141 (App.Div.1983). Signatures on the check were forged and the check was cashed. *Id.* The Court addressed the question whether "it was reasonably foreseeable that a theft of checks kept in a bank vault would occur?" *Id.* at 336, 443 A.2d 1108. Although, of course, bank robberies and thefts at banks have occurred throughout history both in this country and internationally, the court found that since there was no previous criminal conduct within that particular bank, no liability could attach. *Id.* at 336–337, 443 A.2d 1108. The Court held that "[i]t would be unjust to require one to anticipate that a crime will be committed unless there has been a warning or unless a previous criminal act occurred *in the same premises.*" *Id.* at 336, 443 A.2d 1108 (emphasis added). No jury could reasonably could conclude that one accidental explosion 50 years ago, one terrorist act in this country almost 30 years ago, and scattered terrorists incidents throughout the

world over the course of the last 30 years would make an incident like the World Trade Center bombing anything more than a remote or theoretical possibility.

■ The fact that Plaintiff alleges that Defendants knew of the possibility that fertilizer products could be or had been used as components in bombs does not save Plaintiff's claim. "Such knowledge ... tends to show only subjective foreseeability, and, ... subjective foreseeability is irrelevant to the [objective] foreseeability determination." *Oquendo*, 939 F.Supp. at 363 (citing *Brown*, 98 N.J. at 168, 484 A.2d 1234).

■ Even assuming Plaintiff could allege facts that would permit a finding of objective foreseeability, the Court finds that Defendants still owed no duty. "Ultimately, [under New Jersey law,] the determination of the existence of a duty is a question of fairness and public policy. Foreseeability of injury to another is important, but not dispositive. Fairness, not foreseeability alone, is the test." *Kuzmicz v. Ivy Hill Park Apartments, Inc.*, 147 N.J. 510, 515, 688 A.2d 1018 (1997). Therefore, while it is clear that objective foreseeability is necessary to the imposition of a duty, it is not sufficient when despite foreseeability, imposing a duty would be unfair.[2]

Imposing a duty on Defendants to anticipate and prevent the use of their fertilizer products as one part of a terrorist device would be grossly unfair. Defendants' products are not detonable without being "mixed" with other substances, "rendered into explosive and energetic material," and "incorporated" into a bomb that requires "assembly." (Amended Complaint ¶¶ 19–29.) Defendants' duty "does not extend to the speculative anticipation of how component parts that are not defective can become potentially dangerous, depending on the nature of their integration into a complex system designed and assembled by another." *Zaza*, 144 N.J. at

62, 675 A.2d 620. Imposing a duty on Defendants would be especially unfair in absence of any special relationship between the Defendants and either the Plaintiff or the terrorists. *See Butler v. Acme Markets, Inc.*, 89 N.J. 270, 277 n. 1, 445 A.2d 1141 (1982) (noting the general rule that "[t]here is no duty to control the conduct of a third person as to prevent him from causing physical harm to another unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection.") (quoting Restatement (Second) of Torts § 315, at 122 (1965)).

Finally, this Court agrees with Defendants that to impose a duty in this case would be to expand the present scope of a manufacturer's duty under New Jersey law. In light of the Products Liability Act, which "has been interpreted as evincing a legislative policy 'to limit the expansion of products-liability law,'" *Zaza*, 144 N.J. at 47, 675 A.2d 620 (citations omitted), this Court will not take a step in the opposite direction. Such a decision is more appropriately for the Legislature.

■ Plaintiff's ability to show the existence of a duty fares even worse under New York law. Under New York law, "a manufacturer of a product may not be cast in damages, either on a strict products liability or negligence cause of action, where, after the product leaves the possession and control of the manufacturer, there is a subsequent modification which substantially alters the product and is the proximate cause of plaintiff's injuries." *Robinson v. Reed–Prentice Div. of Package Mach. Co.*, 49 N.Y.2d 471, 426 N.Y.S.2d 717, 403 N.E.2d 440, 441 (1980).

In *Robinson*, the plaintiff was injured on his employer's machine, which was purchased

---

2. Even if fairness is the ultimate test, objective foreseeability would still be required because imposing a duty to prevent unforeseeable harms would clearly be unfair. Furthermore, such a burden on manufacturers would greatly expand the scope of their liability and increase their costs. Such a result is contrary to the State Legislature's policy as reflected in the Act, which

sought "'to limit the expansion of products-liability law.' The Legislature intended for the Act to limit the liability of manufacturers so as to 'balance[ ] the interests of the public and the individual with a view towards economic reality.'" *Zaza*, 144 N.J. at 47–48, 675 A.2d 620 (citations omitted) (change in original).

from the defendant manufacturer. *Id.* The plaintiff's employer had removed portions of the safety glass that would have prevented the plaintiff's injuries. *Id.* 403 N.E.2d at 442. The plaintiff brought an action against the manufacturer under negligence and strict liability theories. *Id.* at 441. The plaintiff's theory was that "a manufacturer's duty is tempered by principles of foreseeability; [t]hus, if a manufacturer knows or has reason to know that its product would be used in an unreasonably dangerous manner, ... it may not evade responsibility by simply maintaining that the product was safe at the time of sale." *Id.* at 442.

New York's high court flatly rejected the plaintiff's theory of liability as a matter of law. The Court held:

> [A manufacturer's duty to use reasonable care in designing its product does not require it to] trace [its] product through every link in the chain of distribution to insure that users will not adapt the product to suit their own unique purposes. The duty of a manufacturer, therefore, is not an open-ended one. It extends to the design and manufacture of a finished product which is safe at the time of sale. Material alterations at the hands of a third party which work a substantial change in the condition in which the product was sold by destroying the functional utility of a key safety feature, *however foreseeable that modification may have been,* are not within the ambit of a manufacturer's responsibility. Acceptance of plaintiff's concept of duty would expand the scope of a manufacturer's duty beyond all reasonable bounds and would be tantamount to imposing absolute liability on manufacturers for all product related injuries.

*Id.* at 444 (citation omitted) (emphasis added); *cf. Purdy,* 530 N.Y.S.2d 513, 526 N.E.2d at 7 ("In the ordinary circumstance, common law in the State of New York does not impose a duty to control the conduct of third persons to prevent them from causing injury to others; liability for the negligent acts of third persons generally arises when the defendant has authority to control the actions of such third persons.") (citations omitted). If the removal of portions of safe-

ty glass in a product constitutes a substantial alteration, then certainly there can be no question that the terrorists' alteration of the Defendants' fertilizer products into an explosive device also constitutes a substantial alteration. If liability was precluded as a matter of law in *Robinson,* this Court does not see how Plaintiff has stated a claim under New York law.

Another case, *McCarthy v. Sturm, Ruger and Co., Inc.,* 916 F.Supp. 366 (S.D.N.Y. 1996), *aff'd,* 119 F.3d 148 (2d Cir.1997), provides even stronger support for the Court's conclusion that Defendants owed Plaintiff no duty as a matter of law. *McCarthy* also arose from a highly publicized terrorist act, the Long Island Railroad "murderous shooting spree" by Colin Ferguson. *Id.* at 368. The plaintiffs brought a negligence and products liability action against the defendant, the company that designed, manufactured, marketed, and sold the ammunition used by Ferguson. *Id.* The ammunition used by Ferguson had hollow points designed to dramatically increase the wounding power of the bullets. *Id.* The plaintiffs alleged that the ammunition was negligently and defectively designed because it "was foreseeable that criminals would use the [ammunition] to injure innocent people such as the plaintiffs." *Id.* at 369. With respect to the plaintiffs' negligence claim, the Southern District found that as a matter of law, the defendant owed no duty to plaintiffs. The Court initially stated that "[t]he New York Court of Appeals has held that foreseeability must be distinguished from duty[;] [t]he issue of foreseeability is only relevant in determining the scope of a preexisting duty; it is not normally used to create a duty." *Id.* (citations omitted). The court further stated:

> Plaintiffs do not allege, however, that any special relationship existed between [the defendant] and Ferguson that would give [the defendant] the authority and ability to control Ferguson's actions. In the absence of such a relationship, New York courts do not impose a duty to control the actions of third parties.... To impose a duty on [the defendant] to prevent the criminal misuse of its products would make it an insurer against such occurrences. Such liability exposure would be limitless

and thus to impose a duty here would be inappropriate.

*Id.* (citation omitted). Moreover, the Court held that the defendant's product was not defective because it performed in the way in which it was designed to perform. *Id.* at 370–71. Therefore, the Court granted the defendant's motion to dismiss for failure to state a claim. *Id.* Similarly, Plaintiff has alleged no special relationship between Defendants and the terrorists that would justify the imposition of a duty to prevent the terrorists' criminal actions.

In a third case, also decided under New York law, *Elsroth v. Johnson & Johnson,* 700 F.Supp. 151 (S.D.N.Y.1988), the Plaintiff was poisoned by Tylenol, a product made by Defendant, with which someone had tampered. One of Plaintiff's design defect theories was that Johnson & Johnson could have made tampering with its product much more difficult by using tablets instead of gelatin capsules. Similar to the urea prills, the "gelatin capsules were safe for their normal, intended use; they bec[a]me unreasonably dangerous only if affirmatively mishandled." *Id.* at 164. The Southern District of New York found that Defendant had, as a matter of law, no duty to anticipate and prevent the criminal tampering of Tylenol even though Johnson & Johnson could have easily substituted other types of pills for the gelatin capsules. *Id.;* *cf. id.* at 163 (noting that in cases involving small handguns or "Saturday Night Specials," that while it was "certainly ... foreseeable that these handguns [would] be misused for criminal purposes, and ... they [were] more susceptible to such misuse than are other firearms, courts repeatedly held that plaintiffs had no claims either because the manufacturer owe[d] no duty to design a product impervious to criminal misuse or because the design of these handguns [was] held reasonable as a matter of law.").

Plaintiff has failed to address either *Robinson* or *McCarthy* in its submissions. Furthermore, although Plaintiff seeks to distinguish *Elsroth,* it does not specifically address that court's analysis with respect to the gelatin capsule claim. In absence of any plausible basis to distinguish these cases, the Court is led to the inescapable conclusion that Plaintiff's allegations are insufficient to state a negligence or strict liability claim under New York law.

## D. Proximate Causation

■ Defendants also claim that, as a matter of law, their actions were not the proximate cause of the World Trade Center bombing. Once again, under New Jersey law *Zaza* sets forth the legal framework:

Utilization of [the] term [proximate cause] to draw judicial lines beyond which liability will not be extended is fundamentally ... an instrument of fairness and policy, although the conclusion is frequently expressed in the confusing language of causation, "foreseeability" and "natural and probable consequences." Many years ago a case in this State hit it on the head when it was said that the determination of proximate cause by a court is to be based "upon mixed considerations of logic, common sense, justice, policy and precedent."

144 N.J. at 64, 675 A.2d 620 (quoting *Caputzal v. Lindsay Co.,* 48 N.J. 69, 77, 222 A.2d 513 (1966)) (additional citations omitted).

■ Even if a defendant breaches a duty owed to plaintiff and but for that breach, the harm to plaintiff would not have occurred, the breach "is not necessarily a substantial factor or proximate cause" *Brown,* 98 N.J. at 172, 484 A.2d 1234 (citation omitted).

Rather, the critical consideration in the context of multiple factors contributing to the cause of the accident, is whether the faulty act was itself too remotely or insignificantly related to the accident. If it can fairly be regarded as sufficiently remote or insignificant in relation to the eventual accident then, in a legal sense, such fault does not constitute "a cause of the accident, ... [but] simply presents the condition under which the injury was received, ...."

*Id.* (quoting *Latta v. Caulfield,* 79 N.J. 128, 133, 398 A.2d 91 (1979) (citations omitted)) (change in original) (omissions in original).

■ More specifically, in terms of a subsequent alteration of a product, "if the original defect, although not the sole cause of

the accident, constituted a contributing or concurrent proximate cause in conjunction with the subsequent alteration, the [original manufacturer] will remain liable." *Brown v. United States Stove Co.*, 98 N.J. 155, 171, 484 A.2d 1234 (1984) (citations omitted). Furthermore, "[t]he critical factor in determining whether a subsequent substantial alteration of a product or its misuse can be attributed to a manufacturer as a proximate result of an original design defect under the risk-utility standard is 'foreseeability.'" *Id.* at 166, 484 A.2d 1234.

 Plaintiff strenuously argues that the issue of proximate causation is for a jury to decide. As with the existence of a duty, however, this Court may, as a matter of law, conclude that Defendants' actions were not the proximate cause of the Plaintiff's injury. "The issue of responsibility for the highly extraordinary consequence is also a matter of law for the court." *Griesenbeck*, 199 N.J.Super. at 140, 488 A.2d 1038 (citations omitted); *accord Caputzal*, 48 N.J. at 78, 222 A.2d 513 ("The idea of non-liability for the highly extraordinary consequence as a matter of law for the court has already been recognized in this state."). Even if the existence of a duty may not be resolved as a matter of law, it may still be appropriate to decide the issue of proximate causation as a matter of law. *See Brown*, 98 N.J. at 174–75, 484 A.2d 1234 (finding a genuine issue of material fact with respect to the existence of a duty, but granting summary judgment on the issue of proximate cause)

 New Jersey courts have held on a number of occasions that proximate causation did not exist as a matter of law. In *Griesenbeck*, in addition to finding that the defendants had, as a matter of law, no duty to prevent the harm to plaintiffs, *see supra* Court's discussion at 402–03, the Court also held that the issue of proximate causation should be decided in favor of the defendants as a matter of law. *Griesenbeck*, 199 N.J.Super. at 140, 488 A.2d 1038. The court held:

Although Mrs. Griesenbeck's· intoxicated condition may have contributed in some manner to the fire and the subsequent unsuccessful attempt to save herself and the children, the Walkers' conduct in serving liquor to their daughter, prior to her driving several miles to her home and an hour or more before the fire was reported, is not so closely and significantly connected with the consequences as to justify the imposition of liability upon the Walkers. If Mrs. Griesenbeck's intoxication was connected with the cause of the fire, it was such a highly extraordinary consequence that justice, fairness and common sense compel the conclusion that the Walkers' assumed conduct may not be considered the proximate cause of the death and injury which befell the Griesenbeck children. The asserted liability of the Walkers is beyond the boundary of that which might justly be deemed a foreseeably probable consequence of their conduct.

*Id.*

In *Jensen*, a man became intoxicated, drove 8 miles from the inn in which he was drinking, and climbed to the top of a tree on a river bank. 216 N.J.Super. at 80, 522 A.2d 1043. The upper branches broke, the man fell to the ground, rolled or fell into the river, and drowned. *Id.* Plaintiffs, the wife, children, and estate of the decedent, sued the inn for negligently serving alcohol to decedent while he was visibly intoxicated. *Id.* The plaintiffs claimed that the decedent's death was caused by his impaired judgment and coordination, which was caused by the defendant's negligence. *Id.*

The court, relying on the "bizarre circumstances" surrounding decedent's death, affirmed the trial court's granting of summary judgment. *Id.* at 83–84, 522 A.2d 1043. The court wrote:

[W]e are satisfied that there is no justification for imposing liability upon defendant for the death of Jensen. The claim in this case is bizarre. It cannot be disputed that Jensen's climbing to the top of the tree, falling and rendering himself unconscious and then drowning in the river is, at the very least, an extraordinary occurrence. Such a sequence of events cannot reasonably be expected to follow from serving alcohol to one who is visibly intoxicated and, in our view, does not provide a fair,

just or common sense basis to visit liability upon defendant. We are not unmindful of the extent to which parties have been held liable for injuries or deaths connected with the wrongful service of alcoholic beverages in this State. However, legal responsibility for the consequences of an act cannot be imposed without limit. The events here transgress the judicial line beyond which liability should not be extended as a matter of fairness and policy.

*Id.* at 82, 522 A.2d 1043 (citations omitted).

Additionally, in *Brown,* the plaintiff suffered burns while he was standing next to a free-standing, unvented space heater that was heating a garage at a salvage yard. 98 N.J. at 162, 484 A.2d 1234. The heater had been manufactured by defendant. *Id.* Although the space heater was designed for heating one or two rooms in a house, plaintiff's employer substantially altered the heater 15 years before the accident, removing safety features, which among other things, allowed the flow of gas in the heater to be unregulated. *Id.* at 162, 164, 484 A.2d 1234. When the accident occurred, the heater was set at a pressure approximately 100 times greater than that for which the heater was designed. *Id.* at 162, 484 A.2d 1234. The plaintiff sued on a design defect theory, claiming that it was foreseeable that these heaters would be substantially altered.

With respect to the issue of proximate causation, the Court concluded that "the record discloses that the heater was deliberately altered for the specific purpose of operating it beyond its safe capacity and, further, it was willfully, persistently and intensively misused in this fashion for an extraordinarily long period of time, perhaps as long as fifteen years." *Id.* at 174, 484 A.2d 1234. The court held, therefore, that as a matter of law, "the subsequent course of misconduct was the independent cause of the accident." *Id.*

Furthermore, in *Caputzal,* defendant installed plaintiff's water softener in plaintiff's home. 48 N.J. at 71, 222 A.2d 513. He drew water from the faucet, made coffee with it, and drank it without any ill effect. *Id.* at 71–72, 222 A.2d 513. At the time, he did not notice whether the water was discolored. *Id.* at 72, 222 A.2d 513. A short while later he

went to brush his teeth and saw the water was rusty or brownish. *Id.* Although he did not imbibe at that time, he thought that the coffee water must have also been in that condition. *Id.* Thinking he had been poisoned, he got faint, laid down, and promptly had a heart attack. *Id.* Plaintiff sued the defendant on theories of strict liability and negligence. *Id.*

Finding that summary judgment was appropriate, the Supreme Court of New Jersey held:

We have no hesitancy in determining here that plaintiff's heart attack, caused by psychic stimuli, was, under the facts before us, so highly extraordinary a result of any conduct of defendants that any acts or omissions of theirs should not be held to be the legal cause thereof.

*Id.* at 79, 222 A.2d 513.

 New York law with respect to the issue of proximate causation has yielded similar results. As with New Jersey law, "questions of whether an intervening act severs the chain of causation depend on the foreseeability of the intervening act and should [generally] be determined by the finder of fact." *McCarthy,* 916 F.Supp. at 372 (citation omitted). "However, in appropriate circumstances, the court may resolve the issue as a matter of law. Those cases generally involve independent intervening acts which operate upon but do not flow from the original act." *Id.*

Thus, in *McCarthy,* the case involving Colin Ferguson and the Long Island Railroad shootings, the court found that "Ferguson's conduct was an extraordinary act which broke the chain of causation" as a matter of law. *Id.* (citation omitted). Therefore, the court found that the plaintiffs' complaint against the ammunition manufacturer failed to state a claim in either negligence or strict liability and granted the defendant's Rule 12(b)(6) motion.

Similarly, in *Jantzen v. Leslie Edelman of New York, Inc.,* the plaintiff's husband was murdered by someone with a shotgun. 206 A.D.2d 406, 614 N.Y.S.2d 744, 745 (2d Dep't 1994). Plaintiff brought a wrongful death action against the defendant, who sold the

shotgun to the murderer. *Id.* 614 N.Y.S.2d at 744–45. The court granted summary judgment, stating: "[A]s a matter of law, there could be no finding of proximate cause under the circumstances of this case[;] [t]he sale of a shotgun merely furnished the condition for the unfortunate occurrence." *Id.* (citations omitted.)

Finally, although not decided under New Jersey or New York law, the Court finds *Gaines–Tabb*, ·the· Oklahoma City bombing case, particularly persuasive. Although the *Gaines–Tabb* court noted that the issue of proximate causation was generally one to be decided by the jury, it granted the fertilizer manufacturer's motion to dismiss for failure to state a claim. The court found that "[t]he nature and character of the intervening [terrorists] acts alleged by Plaintiffs are such that reasonable jurors could not fail to find that those acts were the supervening cause of Plaintiffs' injuries." *Gaines–Tabb*, at ——. In explaining its rationale, the Court wrote:

> Notwithstanding Plaintiffs' conclusory allegations to the contrary, the availability of Defendant's ammonium nitrate, whether low-density explosive grade or high-density in form, may have made it easier for whoever bombed the Murrah Building to carry out their intent or plan to do so, *but Defendant's production, marketing or sale of ammonium nitrate in whatever form did not logically compel or induce the bombing, and certainly conception of a plan to bomb a building or the bombing itself is not an ordinary response to and does not logically flow from the availability of ammonium nitrate in whatever form in the fertilizer market. It defies all logic and common sense to suggest that the very existence or availability of a substance which can be used as or employed in a weapon invites persons to use it as or in a weapon ....* As Defendant aptly puts it, "[t]he bombing did not occur because [the terrorists] acquired [ammonium nitrate] fertilizer. The bombing occurred only because of the terrorists' intent to cause harm ...."

*Id.* at —— (first change in original) (citations omitted) (emphasis added). Plaintiff's efforts to. distinguish *Gaines–Tabb*, particularly with respect to this portion of that court's conclusions, are ineffective.

None of the cases previously discussed involve scenarios that are any more "extraordinary" than the one alleged here. In light of these cases, particularly *Gaines–Tabb*, this Court has no trouble concluding, under New Jersey or New York law, that the World Trade Center bombing was not, as a matter of law, the natural or probable consequence of any design defect in Defendants' products. Furthermore, the terrorists' acts were clearly superseding and intervening events breaking the chain of causation. As in *Gaines–Tabb*, the availability of fertilizer in whatever form "did not logically compel or induce the bombing." The World Trade Center explosion was not proximately caused by Defendants; rather, it was caused solely by the terrorists intent to cause harm. Therefore, under either New Jersey or New York law, Plaintiff fails to state a claim for which relief may be granted.

### E. Failure to Warn

■ Defendants make two additional arguments as to why Plaintiff's failure to warn claim must be dismissed. First, Defendants argue that they owed no duty to make the warnings described in Plaintiff's Amended Complaint. Plaintiff does not seek to hold Defendants liable for failing to warn properly the users of the fertilizer, *i.e.*, the terrorists, of the dangers associated with the fertilizer products. (Opp. Br. at 24.) Plaintiff is wise to disavow reliance on such a theory. It seems beyond dispute that the terrorists were fully aware of the potential dangers associated with Defendants' products. To require Defendants to warn of a danger of which the users of the product were already aware would be pointless. *See Zaza*, 144 N.J. at 63, 675 A.2d 620.

Instead, Plaintiff argues that the duty owed by Defendants was to warn the middlemen-the distributors, wholesalers, retailers, and other suppliers. Plaintiff alleges that Defendants should have provided "guidelines, instructions and/or warnings ... to confirm that buyers in the general and unrestricted public market have legitimate and lawful purposes for use of defendants' products."

(Amended Complaint ¶ 71.) Defendants respond that they owed no duty to warn these entities-that their duty was limited to warning direct customers or other foreseeable users of the fertilizer.

Plaintiff recognizes that under New Jersey's Product Liability Act warnings are only required to "persons by whom the product is intended to be used." N.J.S.A. § 2A:58C–4. Plaintiff argues, however, that since "[t]his act is not intended to codify all issues related to product liability," id. § 2A:58C–1, that the Legislature did not intend to bar Plaintiff's theory of liability. (Opp. Br. at 24.) The problem with Plaintiff's argument, however, is that even if it is true that the Act did not preclude Plaintiff's theory, Plaintiff has not identified a single case under the common law that establishes such a duty.

With respect to New York law, Plaintiff argues that "[t]he courts of New York require warnings be given to those who are reasonably expected to be exposed to harm if they are not warned." (Opp. Br. at 24–25 (citing *Tucci v. Bossert*, 53 A.D.2d 291, 385 N.Y.S.2d 328 (2d Dep't 1976)).) Even if this theory is cognizable, Plaintiff does not explain how it applies, since there is no allegation that the distributors, retailers, dealers, or other suppliers of Defendants' products were exposed to harm.

Plaintiff has not identified a single case that has recognized a duty to warn middlemen that consumers may alter the products they sell and harm third parties after the products leave their control. The Court does not believe that the New Jersey Supreme Court or the New York Court of Appeals would create this broad, previously unrecognized, duty and declines to be the one to open Pandora's box without stronger support for Plaintiff's position. *See Zaza*, 144 N.J. at 47, 675 A.2d 620 ("The Act has been interpreted as evincing a legislative policy 'to limit the expansion of products-liability law.' ") (citation omitted); *McCarthy*, 916 F.Supp. at 369 ("[I]n determining the existence of a duty, New York courts attempt to limit the scope of potential liability to a controllable degree in an effort to protect defendants from infinite liability exposure.") (citations omitted).

Defendants also argue that Plaintiff's failure to warn claim must be dismissed because Plaintiff is unable to allege facts showing that an adequate warning would have prevented the harm. (Reply Br. at 15–16.)

This Court agrees. Under New Jersey law, "[i]n a product liability case plaintiff has the burden of proving that the failure to give adequate warnings was a proximate cause of the accident and injuries and that the failure was a substantial factor in bringing about the happening of the accident." *Malin v. Union Carbide Corp.*, 219 N.J.Super. 428, 439, 530 A.2d 794 (App.Div. 1987) (citation omitted). "If the basis for recovery under strict liability is inadequacy of warnings or instruction about dangers, then *plaintiff would be required to show that an adequate warning or instruction would have prevented the harm*." *Id.* (quoting *Campos v. Firestone Tire & Rubber Co.*, 98 N.J. 198, 209, 485 A.2d 305 (1984) (quoting Keeton, *Products Liability—Inadequacy of Information*, 48 Tex. L.Rev. 398, 414 (1970))). New York law on this issue is identical. *See Elsroth*, 700 F.Supp. at 167 ("Simply put, this tragedy would have occurred whether or not there had been a warning ..., and the claim, therefore, must fail.") (citation omitted).

Plaintiff responds that under New Jersey law it is entitled to what is called the "heeding presumption." Under this doctrine, the Court presumes that a warning by Defendants would have been heeded and prevented the harm. *See Coffman v. Keene Corp.*, 133 N.J. 581, 595, 628 A.2d 710 (1993). "[T]he heeding presumption serves to eliminate conjecture about whether a given plaintiff would have heeded a hypothetical warning, and discourages determinations of causation that are based on extraneous, speculative considerations and unreliable or self-serving evidence." *Facendo v. S.M.S. Concast, Inc.*, 286 N.J.Super. 575, 584, 670 A.2d 44 (1996) (quoting *Theer v. Philip Carey Co.*, 133 N.J. 610, 619, 628 A.2d 724 (1993)). Even if the heeding presumption applied to distributors, wholesalers, retailers, and suppliers, as opposed to just users

**410**

and consumers, Plaintiff's own factual allegations rebut the presumption. Basically, Plaintiff argues that Defendants should have warned middlemen of the potential danger of criminal misuse of their fertilizer products. In light of the elaborate efforts the terrorists went through to commit their heinous crime, it would defy all logic, common sense, and fairness, the touchstones of proximate causation, to presume that the World Trade Center bombing would have been prevented had Defendants warned their middlemen not to sell to terrorists because terrorists might use the fertilizer to create a bomb. Given the terrorists' obvious determination, the Court cannot presume that even if the middlemen heeded this warning, the terrorists' plan would have been thwarted. The Court finds that no reasonable jury could conclude that Plaintiff's suggested warnings would have prevented the crime. Accordingly, Plaintiff's failure to warn claim must be dismissed.

## III. CONCLUSION

Fertilizer bombs have recently caused two terrible tragedies in this Country, which have resulted in unspeakable losses. Tragedy invokes our sympathy, but sympathy must not substitute for legal liability. And while Plaintiff invites the Court to recognize its claim in order to induce the fertilizer industry to reduce the risk that other terrorists will avail themselves of these products, this Court simply cannot acknowledge a cause of action that the law does not permit. If the danger from fertilizer explosives can be reduced by additives, it is a subject that is more appropriately addressed by the Legislature.

For the reasons discussed above, Plaintiff fails to state a claim upon which relief may be granted. Defendants' motion to dismiss, therefore, is **granted**. Since the Court is unable to fathom how further amendments to the Amended Complaint will allow Plaintiff to state a claim, Plaintiff's Amended Complaint is **dismissed with prejudice**.