

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-18-1999

# Port Auths. of NY & NJ v. Arcadian Corp.

Precedential or Non-Precedential:

Docket 98-5045

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"Port Auths. of NY & NJ v. Arcadian Corp." (1999). *1999 Decisions.* Paper 227.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/227

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 18, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-5045

PORT AUTHORITY OF NEW YORK AND NEW JERSEY,
        Appellant

v.

ARCADIAN CORP;
DYNO NOBEL INC, f/k/a
*Ireco Incorporated;
HYDRO AGRI NORTH AMERICA, INC.
        (*Amended per clerk's
        order of 2/20/98)

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 96-cv-01635)
District Judge: Honorable William G. Bassler

Argued September 17, 1998

Before: ROTH and STAPLEON,
Circuit Judges HOEVELER,1 District Judge

(Opinion Filed: August 18, 1999)

_____

1. Honorable William M. Hoeveler, United States District Court Judge for
the Southern District of Florida, sitting by designation.

William B. McGuire, Esquire
 (Argued)
Marianne Espinosa Murphy, Esquire
George G. Campion, Esquire
Tompkins, McGuire & Wachenfeld
100 Mulberry Street, Gateway Four
Newark, NJ 07102

Samuel J. Pace, Jr., Esquire
 (Argued)
Leslie M. Cyr, Esquire
Dugan, Brinkmann, Maginnis &
 Pace
1880 John F. Kennedy Boulevard,
 14th Floor
Philadelphia, PA 19103

 Attorneys for Appellant

Richard D. Shapiro, Esquire
Hellring, Lindeman, Goldstein &
 Siegal
One Gateway Center, 8th Floor
Newark, NJ 07102

Philip T. Bruns, Esquire
Jennifer Horan Greer, Esquire
Andrew L. Pickens, Esquire
Gibbs & Bruns, L.L.P.
1100 Louisiana, Suite 5300
Houston, TX 77002

 Attorneys for Appellee
Arcadian Corporation

Andrew T. Berry, Esquire
Kevin J. Connell, Esquire
McCarter & English
100 Mulberry Street, Four Gateway
 Center
Newark, NJ 07101-0652

        John T. Montgomery, Esquire
          (Argued)
        Michael P. Allen, Esquire
        Douglas Hallward-Driemeier, Esquire
        Ropes & Gray
        One International Place
        Boston, MA 02110-2624

         Attorneys for Appellee
        Hydro Agri North America, Inc.

        Peter N. Perretti, Jr., Esquire
        Glenn A. Clark, Esquire
        Riker, Danzig, Scherer, Hyland &
         Perretti
         One Speedwell Avenue
         Morristown, NJ 07962-1981

         Attorneys for Appellee
         Dyno Nobel Inc.

OPINION OF THE COURT

ROTH, Circuit Judge:

This case arises from the February 26, 1993, terrorist detonation of an explosive device under the World Trade Center in New York City, which caused six deaths, many injuries and massive property damage. Plaintiff-appellant, the Port Authority of New York and New Jersey, owner of the World Trade Center, sued defendants, manufacturers of fertilizer products, on theories of negligence and products liability, alleging that the terrorists used defendants' fertilizer products to construct the explosive device.

The District Court, in a thorough and well-reasoned opinion, granted defendants' motion to dismiss for failure to state a claim upon which relief may be granted under Fed. R. Civ. P. 12(b)(6). Plaintiff appealed. We find that it was appropriate, in light of the record, for the District Court to dismiss the action under Rule 12(b)(6). Specifically, we agree with the District Court that as a matter of law defendants owed no duty to plaintiff and that the World

3

Trade Center bombing was not proximately caused by defendants' actions. Furthermore, we reject plaintiff's argument that the issues of duty and proximate causation were jury issues not properly decided by the court on a Rule 12(b)(6) motion. Accordingly, we will affirm the judgment of the District Court.

I. Factual and Procedural History

A. Factual Background

The Port Authority of New York and New Jersey is the owner of the World Trade Center in New York City. On February 26, 1993, a bomb, which had been fabricated by terrorists out of ammonium nitrate, urea, and nitric acid, exploded in an underground parking garage at the World Trade Center, causing six deaths, many injuries and massive property damage.

The ammonium nitrate, urea, and nitric acid used in the bomb were allegedly sold in New Jersey, and the bomb was allegedly assembled in New Jersey by New Jersey residents. Defendants Hydro-Agri North America, Inc., and Dyno Nobel Inc., formerly known as Ireco, Inc., are alleged to have manufactured, designed, marketed, distributed and/or sold the ammonium nitrate used by the terrorists. Defendant Arcadian Corporation is alleged to have manufactured, designed, marketed, distributed and/or sold the urea used by the terrorists.

The ammonium nitrate and urea, alleged to have been purchased by the terrorists, were sold in prill form, i.e., a white, round, hardened droplet about the size of the tip of a ball point pen. The prills were manufactured to be used as fertilizer. The ammonium nitrate prills can be rendered explosive by the addition of fuel oil or other sensitizing substances; the urea prills can be rendered explosive by the addition of nitric acid and water (forming urea nitrate). The terrorists are alleged to have rendered the prills explosive by adding these substances. Defendants point out that, as conceded in the Amended Complaint, the prills are not explosive in and of themselves.

Plaintiff alleges that defendants knew or should have known that the ammonium nitrate and urea could easily be

4

made into explosives and that terrorists had used them prior to the bombing at the World Trade Center, but nevertheless defendants failed to take appropriate steps to render their products non-detonable. Specifically, plaintiff points to two incidents. First, an explosion of ammonium nitrate over fifty years ago destroyed two ships docked at Texas City, Texas, killing 468 persons and causing extensive damage in the city. Second, more than thirty years ago, anti-war protesters used ammonium nitrate to bomb the Mathematics Research Building at the University of Wisconsin, leading to injuries, death and property damage.

Plaintiff alleges that defendants had the means to reduce the danger of their products. In 1968, Samuel Porter patented a process that rendered ammonium nitrate fertilizers non-detonable. The process called for adding five to ten percent of diammonium phosphate, a high grade of fertilizer, to ammonium nitrate at a nominal additional cost. When the patent was made available to ammonium nitrate manufacturers, one of the explicit purposes was to deter the criminal use of ammonium nitrate in bombs. In 1985, the Porter patent entered the public domain, making the process available to all manufacturers free of license or royalty.

Plaintiff alleges that the danger of these products prompted governments here and abroad to attempt to regulate their manufacture and distribution. Specifically, in response to the University of Wisconsin bombing, several states introduced legislation to require that all ammonium fertilizers be desensitized by a chemical agent (as described in the Porter patent) to reduce, if not eliminate, the explosive properties of ammonium nitrate. The legislative efforts were allegedly well publicized, including within the fertilizer industry, but plaintiff asserts that various fertilizer manufacturers resisted the legislation, leading to its ultimate defeat.

In addition, in 1975, the European Economic Community Council issued a directive that established (1) strict standards for the formulation of solid ammonium nitrate and (2) detonation tests that could be required by member countries to ensure that fertilizer sold in those countries

5

had a low potential for use as explosive. Belgium, Denmark, Germany and the Netherlands prohibited the sale of certain ammonium nitrate fertilizers. France mandated that all ammonium nitrate fertilizer be tested by detonation.

Three years prior to the EEC directive, terrorist bombings in Northern Ireland and the Republic of Ireland prompted the United Kingdom and Ireland to enact regulations that were even more stringent. Those regulations limited the amount of nitrate that could be used in fertilizer products and required the addition of calcium, sulfates, and other materials to reduce their detonability.

Information about urea and the means to desensitize it was allegedly similarly well known, yet not utilized, prior to the World Trade Center bombing. It was allegedly known that the addition of phosphate and other additives to urea prills would decrease or eliminate their use as explosive and energetic materials. Explosives made of urea nitrate were allegedly used in the Middle East, South America, Pakistan and the United States prior to the World Trade Center bombing. In 1992, the sales of urea and ammonium nitrate fertilizer were banned in Peru as a result of the extensive use of urea and ammonium nitrate prills in explosives set off by the Shining Path terrorists.

B. Procedural Background

Plaintiff filed this action on February 26, 1996, in the Superior Court of New Jersey in Essex County. Defendants removed the actions to the United States District Court for the District of New Jersey on the grounds of diversity of citizenship. Plaintiff filed an Amended Complaint before defendants responded to the original Complaint, in order to correct the name of one of the defendants.

The Amended Complaint asserts three grounds for holding defendants liable. Count I, a claim of negligence, asserts that defendants "negligently failed to design, manufacture, market, distribute and/or sell [ammonium nitrate or urea prills] with a formulation" that would either "render them less detonable or non-detonable" or "decrease or eliminate their explosive properties." Count II, a claim in strict liability, asserts that defendants are liable because the ammonium nitrate and urea prills were "unreasonably

6

dangerous and defective when they left the respective control of each of the Defendants." Count III asserts that defendants are liable because they "failed to provide guidelines, instructions, and/or warnings to their distributors, retailers, dealers or other suppliers to confirm that buyers in the general and unrestricted public market have legitimate and lawful purposes for use of Defendants' products."

Defendants filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). The District Court granted the motion and dismissed the Complaint with prejudice. See Port Authority of New York & New Jersey v. Arcadian Corp., 991 F. Supp. 390 (D.N.J. 1997). Plaintiff filed a timely appeal.

II. Analysis

A. Standard of Review

The standard of review of a district court order dismissing a complaint under Fed. R. Civ. P. 12 (b)(6) is plenary. Alexander v. Whitman, 114 F.3d 1392, 1397 (3d Cir. 1997). The court "must determine if plaintiff may be entitled to relief under any reasonable reading of the pleadings, assuming the truth of all the factual allegations in the complaint." Id. (citations omitted). "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations." Id.

B. Jurisdiction

The District Court had diversity jurisdiction pursuant to 28 U.S.C. S 1332. Because this is an appeal from a final order of the District Court, we have jurisdiction pursuant to 28 U.S.C. S 1291.

C. Choice of Law

As an initial matter, the District Court found it was not necessary to make a determination whether New York or New Jersey law applies to the Amended Complaint. Instead, the District Court determined that the Amended Complaint failed to state a claim under the law of either state. The District Court's approach was appropriate. A federal court

sitting in diversity applies the choice of law principles of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941). Under New Jersey law, when the same result -- dismissal of a complaint -- is required under the laws of all relevant jurisdictions, the court need not decide which law would apply to the action. See Rohm & Haas Co. v. Adco Chem. Co., 689 F.2d 424, 429 (3d Cir. 1982); Mueller v. Parke-Davis, 599 A.2d 950, 954 (N.J. Super. Ct. App. Div. 1991). Because we agree that dismissal is required under both New Jersey and New York law, we similarly need not decide the choice of law issue.

D. The District Court's Application of Fed. R. Civ. P. 12(b)(6)

We first address plaintiff's argument that the District Court erred in failing to recognize the legal sufficiency of the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiff argues that, although the District Court quoted the correct standard under Rule 12(b)(6), it misapplied it to the case. In essence, plaintiff contends that the Amended Complaint alleges facts sufficient to plead the elements of the causes of action (under either jurisdiction) but that the District Court elected to conclude that a jury could not rule in favor of plaintiff under any set of facts consistent with the Amended Complaint. Plaintiff argues that this ruling was premature and inconsistent with the mandate that the District Court must interpret allegations in the light most favorable to the plaintiff. Plaintiff argues that, in dismissing the complaint, the District Court made rulings on factual issues of foreseeability and proximate cause, which are traditionally the province of the jury. In sum, plaintiff claims that the District Court exceeded its limited role in reviewing the sufficiency of a complaint and that plaintiff is entitled to discovery and to present evidence to a jury because the allegations in the Amended Complaint are sufficient.

We find, however, that the District Court applied the standard correctly. Thus, the District Court assumed that the facts alleged in the Amended Complaint were true but determined that the facts, even if true, could not legally support plaintiff's claims. Plaintiff disagrees with this conclusion in two respects. First, plaintiff contends that the

District Court's task was merely to go through a check list for the elements of a tort claim. Consequently, since the Amended Complaint contained all the elements of the causes of action pled, the motion to dismiss should have been denied. Rule 12(b)(6), however, is designed to screen out cases where "a complaint states a claim based upon a wrong for which there is clearly no remedy, or a claim which the plaintiff is without right or power to assert and for which no relief could possibly be granted . . .." Melo-Sonics Corp. v. Cropp, 342 F.2d 856, 859 (3d Cir. 1965) (quoting Leiman v. State Mutual Life Assurance Co., 108 F.2d 302, 305-06 (8th Cir. 1940)). We find that the District Court carried out this mandate by taking all the allegations in the Amended Complaint as true and making every favorable inference in favor of plaintiff but deciding nevertheless that no relief could be granted.2

Second, we disagree with plaintiff's insistence that the District Court misapplied Rule 12(b)(6) by considering whether plaintiff's claims were sufficient as a matter of "fairness" or "sound policy." Plaintiff argues that such considerations improperly substituted the court's views for those of the jury. Plaintiff, however, misunderstands the role of the courts in developing and administering the tort system. Tort law is essentially concerned with the "allocation of losses" arising out of "socially unreasonable conduct." Prosser & Keeton, The Law of Torts, S 1 at 6. The courts must consider not only the interests of the litigants but also the interests of society in general, including the social and economic costs of any expansion of the outer boundaries of tort liability. Id. This consideration

_____

2. Plaintiff argues that District Court Judge Bassler indicated during oral argument that he believed that plaintiff would prevail if the case was presented to a jury. "Then at the end, I mean, I can't believe a jury not bringing recovery on the facts of this case." App. 172a, T30-23. This quote is taken out of context. Judge Bassler was asking counsel whether judicial economy would be served by having a Third Circuit opinion on the issue before investing tremendous resources and going to trial. In other words, the judge was speculating that a jury would probably find for plaintiff on the facts of the case at trial. He was not indicating that he believed a legal basis existed for it to do so. And in dismissing the case, he ruled as a matter of law that recovery was precluded.

9

necessarily involves considerations of social and public policy. Id.

As we will explore more fully below, the legal bounds of duty and of proximate cause are aspects of tort law in which issues of fairness and public policy are particularly relevant. We conclude that the District Court properly considered questions of fairness and policy and made rulings of law on issues of reasonable foreseeability and proximate causation. Moreover, a jury would be asked to determine if a duty had been violated or if the harm in question had been proximately caused by the defendants only after the court had determined as a matter of law either that defendants did have a duty to safeguard plaintiff from the risk of these bombs or that the defendants' supplying the terrorists with a component of these bombs was a legal proximate cause of plaintiff's damages. Because the District Court found as a matter of law that there was no duty and no proximate causation, there was nothing for a jury to consider.

E. Duty

The District Court properly concluded that the Amended Complaint failed to establish the existence of a duty owed by defendants. Under both New Jersey and New York law, the question of whether a duty is owed is a question of law to be decided by the court. Strachan v. John F. Kennedy Mem'l Hosp., 538 A.2d 346, 349 (N.J. 1988) ("The question of whether a duty exists is a matter of law properly decided by the court. . . ."); Purdy v. Public Adm'r , 526 N.E.2d 4, 6 (N.Y. 1988) ("The question of whether a member or group of society owes a duty of care to reasonably avoid injury to another is of course a question of law for the courts.").

Under the law of either jurisdiction, it is appropriate for us to focus on product liability principles in determining if defendants did owe plaintiff a duty. Under New Jersey law negligence is no longer viable as a separate claim for harm caused by a defective product. Oquendo v. Bettcher Indus., Inc., 939 F. Supp. 357, 361 (D.N.J. 1996) (citing Tirrell v. Navistar Int'l, Inc., 591 A.2d 643 (N.J. Super. Ct. App. Div. 1991)). Even though plaintiff alleges a negligence claim in Count I, this count is based solely on harm caused by

10

defendants' allegedly defective products. It therefore falls within the New Jersey Product Liability Act (the"NJPLA"), N.J.S.A. 2A:58C-1 et seq., which is "the sole basis of relief under New Jersey law available to consumers injured by a defective product." Repola v. Morbark Indus., Inc., 934 F.2d 483, 492 (3d Cir. 1991). Similarly, under New York law, theories of negligence and strict liability for design and warning defects are functionally equivalent. Elsroth v. Johnson & Johnson, 700 F. Supp. 151, 158 n.9 (S.D.N.Y. 1988) (citing DeRosa v. Remington Arms Co., 509 F. Supp. 762, 766 (E.D.N.Y. 1981), and Cooley v. Carter-Wallace, Inc., 478 N.Y.S.2d 375, 379 (App. Div. 1984)). A"plaintiff can recover nothing in negligence on his products claims that he cannot first recover under his strict liability claims asserting product, design, and warning defects." Id. at 158.

We find that defendants owed no duty to plaintiff under either New Jersey or New York law. First, the manufacturer of a raw material or component part that is not itself dangerous has no legal duty to prevent a buyer from incorporating the material or the part into another device that is or may be dangerous. By plaintiff's own allegations, defendants' products were not in and of themselves dangerous but were merely the raw materials or components that terrorists used in combination with other ingredients to build a bomb. Second, manufacturers have no duty to prevent a criminal misuse of their products which is entirely foreign to the purpose for which the product was intended.

The New Jersey Supreme Court examined the duties of a component manufacturer in Zaza v. Marquess & Nell, Inc., 675 A.2d 620 (N.J. 1996). In that case, the plaintiff was injured when hot water and carbon overflowed from a quench tank he was attempting to unclog. The quench tank was a component part of a coffee bean decaffeination process. The defendant, who had manufactured the quench tank, knew from designs that, once integrated into the larger system, the tank would need certain safety devices. Nevertheless, the New Jersey Supreme Court held that the component part manufacturer owed the plaintiff no duty regarding any danger posed by the integrated device, stating that a component part fabricator may only be held

11

"strictly liable for injury caused by a defective component where the defect is in the component part and the part did not undergo substantial change after leaving the manufacturer's hands." Id. at 636.3 The court relied on a tentative draft of the Restatement (Third) of Torts, in which the American Law Institute "concluded that a component part manufacturer generally is not liable unless the component part is defective or the component provider substantially participated in the design of the final product." Id. at 629. The court also followed the "majority of courts from other jurisdictions [which] have held that a manufacturer of a component part, which is not dangerous until it is integrated by the owner into a larger system, cannot be held strictly liable to an injured employee for the failure of the owner and/or assembler to install safety devices." Id.

In the instant case, there is no allegation that the

_____

3. We disagree with the District Court's conclusion that New Jersey has rejected the component part doctrine. See Port Authority, 991 F. Supp. at 400. The District Court relied on Zaza's reference to Michalko v. Cooke Color & Chem. Corp., 451 A.2d 179 (N.J. 1982), in which the court had held that a manufacturer of a component party must add a safety device if it is feasible. The court in Zaza, however, explained that "[a] further requirement for the imposition of strict liability on a component part fabricator is that the component part reach the user without substantial change. Where a component part is subject to further processing, or where the causing of the injury is not directly attributable to any defect in the component part, the fabricator is typically not subject to strict liability." Zaza, 675 A.2d at 629 (citation omitted). By contrast, in Michalko, the court held that there was no substantial change to the defendant's product, because its defect (the failure to add a safety device) was "untouched and remained unaffected by" the subsequent work on the machine. Michalko, 451 A.2d at 186. In the instant case, it is undisputed that the fertilizer products underwent substantial change after leaving defendants' hands.

The two other cases relied on by the District Court did not involve raw materials or component parts, but rather, purchasers who had removed safety devices from the defendants' finished products. See Port Authority, 991 F. Supp. at 400 (citing Oquendo, 939 F. Supp. at 362 (removal of point-of-operation guard and rewiring to bypass interlock mechanism); and Brown v. United States Stove Co., 484 A.2d 1234, 1239-41 (N.J. 1984) (purchaser removed safety valves from space heater)).

12

fertilizer products were dangerous in and of themselves. Under plaintiff's own allegations, the raw ammonium nitrate and urea sold by defendants were not explosive until the terrorists purposefully manipulated and adulterated them by mixing them together with additional chemicals such that they were transformed into energized materials that could be incorporated into an explosive charge. The danger to plaintiff was presented not by the raw materials, but by a bomb that incorporated the raw materials after they had been substantially altered. In addition, defendants had no control over the fertilizer once it was sold and no control over the final assembly of the bomb.

Moreover, under the NJPLA, a plaintiff must prove "that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose." N.J.S.A. 2A:58C-2 (emphasis added); see also Zaza, 675 A.2d at 627 (stating that a "manufacturer has a duty to ensure that the products its places into the stream of commerce are safe when used for their intended purposes"). The "unforeseeable misuse of a product may not give rise to strict liability." Suter v. San Angelo Foundry and Mach. Co., 406 A.2d 140, 144 (N.J. 1979). "A product is not in a defective condition when it is safe for normal consumption and handling." Id. (quoting Restatement (Second) of Torts, S 402A cmt. h). Where "the use of the product is beyond its intended or reasonably anticipated scope," an injury resulting from that use is "not . . . probative of whether the product was fit, suitable, and safe." Id. There is no allegation here that the fertilizer products were unsafe for their intended purposes, that is, when used as fertilizer.

Plaintiff attempts to argue that defendants should be liable nonetheless because the New Jersey courts have held that a manufacturer's duty also encompasses objectively foreseeable misuses and alterations. See Oquendo, 939 F. Supp. at 362 (D.N.J. 1996) ("New Jersey courts have held manufacturers strictly liable for products, despite another's subsequent substantial alterations, where those alterations were objectively foreseeable and likely to cause injuries."); Jurado v. Western Gear Works, 619 A.2d 1312, 1317 (N.J. 1993) ("Hence, the plaintiff in a design-defect products liability suit may succeed even if the product was misused,

13

as long as the misuse or alteration was objectively foreseeable."); Soler v. Castmaster, 484 A.2d 1225, 1232 (N.J. 1984) ("Thus, in the event of either a substantial alteration or misuse, the manufacturer will be responsible for resultant injuries to an operator if the alteration or misuse implicated in the actual use of the machine was foreseeable and could have been prevented or reduced by the manufacturer.").

We conclude, however, that the alteration and misuse of defendants' fertilizer products were not objectively foreseeable. We reject, therefore, plaintiff's attempt to hold defendants liable under this theory. The court in Oquendo set forth New Jersey law as follows:

> Objective foreseeability means reasonable foreseeability. The standard "does not affix responsibility for future events that are only theoretically, remotely, or just possibly foreseeable, or even simply subjectively foreseen by a particular manufacturer." . . . Rather it "applies to those future occurrences that, in light of the general experience within the industry when the product was manufactured, objectively and reasonably could have been anticipated."

Oquendo, 939 F. Supp. at 362 (quoting Brown v. United States Stove Co., 484 A.2d 1234, 1241 (N.J. 1984)). Significantly, the fact that plaintiff alleges that defendants were aware of previous instances in which fertilizer products were used in bombs does not suffice to establish objective foreseeability. "Such knowledge . . . tends to show only subjective foreseeability, and . . . subjective foreseeability is irrelevant to the [objective] foreseeability determination." Id. at 363.

Plaintiff argued below, and again on appeal, that the issues of objective foreseeability and reasonableness should be left for a jury to decide. We recognize that these issues are indeed generally a matter to be determined by a jury. See Soler, 484 A.2d at 1234. An exception is to be made, however, where "the inferences are so clear that a court can say as a matter of law that a reasonable manufacturer could not have foreseen the change." Id. (quoting

14

parenthetically Merriweather v. E.W. Bliss Co. , 636 F.2d 42, 45 (3d Cir. 1980) (quoting D'Antona v. Hampton Grinding Wheel Co., 310 A.2d 307 (Pa. Super. Ct. 1973)).

The inferences in this case are indeed so clear that we can say as a matter of law that the transformation and integration of the otherwise safe fertilizer products into the type of explosive device used in the World Trade Center bombing was not objectively foreseeable to the defendants at the time of this bombing. We agree with the District Court's conclusion that:

> No jury could reasonably could conclude that one accidental explosion 50 years ago, one terrorist act in this country almost 30 years ago, and scattered terrorists incidents throughout the world over the course of the last 30 years would make an incident like the World Trade Center bombing anything more than a remote or theoretical possibility.

Port Authority of New York & New Jersey, 991 F. Supp. at 402–03.

We, of course, must follow the precedents of the New Jersey Supreme Court. Travelers Indemnity Co. v. DiBartolo, 131 F.3d 343, 348 (3d Cir. 1997). The District Court's conclusion is consistent with the refusal of the New Jersey Supreme Court to impose a duty in cases involving outrageous misuses of a product wholly unrelated to its intended purpose, where such a duty would expose manufacturers to endless liability. See, e.g. , Jurado, 619 A.2d at 1318 ("If . . . a plaintiff undertakes to use his power saw as a nail clipper and thereby snips his digits, he will not be heard to complain. . . .") (citation omitted); Suter, 406 A.2d at 144 ("[T]he manufacturer of a knife cannot be charged with strict liability when the knife is used as a toothpick and the user complains because the sharp edge cuts."); see also Taylor v. General Elec. Co., 505 A.2d 190, 193 (N.J. Super. Ct. App. Div. 1986) (holding that bleach manufacturer had no duty to warn against using plastic Clorox bottles to carry gasoline because such a duty would cover an infinite variety of misuses).

We agree with the District Court that imposing a duty on defendants in this case would be unfair. "Ultimately, the

15

determination of the existence of a duty is a question of fairness and public policy. Foreseeability of injury to another is important, but not dispositive. Fairness, not foreseeability alone, is the test." Kuzmicz v. Ivy Hill Park Apartments, Inc., 688 A.2d 1018, 1020 (N.J. 1997). Indeed, it would be grossly unfair to impose a duty on defendants to anticipate and prevent the use of their products as one part of a terrorist's explosive device. Their products were not explosive in and of themselves, without being mixed with other substances and incorporated into a bomb.

Finally, imposing a duty in this case would expand the scope of manufacturers' liability under New Jersey law, a result contrary to the legislative policy of the NJPLA, which "has been interpreted as evincing a legislative policy to limit the expansion of products-liability law." Zaza, 675 A.2d at 627 (internal quote marks omitted). We leave such an expansion of duty to the legislature.

Similarly, under New York law, we find that no duty exists that would provide a basis for liability. The manufacturer of a component part is not liable for the ways in which a purchaser subsequently processes or integrates that product. In Munger v. Heider Mfg. Corp., 456 N.Y.S.2d 271, 273 (App. Div. 1982), the court held that manufacturers of component parts, not themselves defectively designed, could not be liable to one injured by the malfunction of the assembled unit. Indeed, under New York law, a manufacturer is not liable where its product became dangerous only due to substantial alteration even if the product is not a component part or raw material. In Robinson v. Reed-Prentice Div. of Package Mach. Co., 403 N.E.2d 440, 441 (N.Y. 1980), the New York Court of Appeals held that "a manufacturer of a product may not be cast in damages, either on a strict products liability or negligence cause of action, where, after the product leaves the possession and control of the manufacturer, there is a subsequent modification which substantially alters the product and is the proximate cause of plaintiff's injuries." In Robinson, the court rejected the plaintiff's attempt to hold a machine manufacturer liable for an injury caused because safety guards were removed, saying "[m]aterial alterations at the hands of a third party which work a

16

substantial change in the condition in which the product was sold . . . are not within the ambit of the manufacturer's responsibility." Id. at 444.

Another New York case, Elsroth v. Johnson & Johnson, 700 F. Supp. 151 (S.D.N.Y. 1988), also establishes that a manufacturer cannot be held liable for failing to add a safety device to its product to prevent other substances from being combined with it. In that case, an individual laced Tylenol capsules with cyanide and replaced the deadly product on store shelves, causing a consumer to die after ingesting the capsules. Id. at 153-54. Thus, like the instant case, Elsroth concerned a criminal who injured a victim by adulterating the defendant's product. The plaintiff alleged that the manufacturer could have prevented the death by producing the drug in caplet form, which would have made it more difficult for a criminal to adulterate the product. Id. at 160, 163. The court rejected this argument, holding that "there exists no common law duty requiring . . . manufacturers to design their product in such a way as to anticipate and frustrate criminal tampering." Id. at 164.

This limiting principle is not altered even if the misuse of the product might be foreseeable. In Elsroth, the defendant's product had been tampered with in the same way four years earlier. Id. at 153. Similarly, in Robinson, the court concluded that the machine manufacturer had no duty to prevent disengagement of a safety device"however foreseeable that modification may have been." Robinson, 403 N.E.2d at 444; see also McCarthy v. Sturm, Ruger, and Co., 916 F. Supp. 366, 369 (S.D.N.Y. 1996) (holding as a matter of law that defendant, a manufacturer of ammunition, owed no duty to prevent the criminal misuse of ammunition, regardless of its foreseeability).

On appeal, plaintiff attempts to distinguish these New York cases on their facts but fails to provide any reason why the principles and rules articulated in them are inapplicable to this case. Plaintiff relies exclusively on the proposition that a manufacturer has a duty to make its product safe when "used for its intended purpose or for an unintended but reasonably foreseeable purpose." Lugo v. LJN Toys, Ltd., 552 N.E.2d 162, 163 (N.Y. 1990); Micallef v. Miehle Co., 348 N.E.2d 571, 577 (N.Y. 1976). The fatal flaw

17

in the argument is that plaintiff ignores the more specific rule applicable here, that where a product has undergone substantial alteration after leaving the manufacturer's control and it is the alteration that creates the danger, the prevention of such alteration is not within the scope of the manufacturer's responsibility. Moreover, Lugo and Micallef, the cases cited by plaintiff, are merely examples of a manufacturer making a product that was unsafe even when used precisely in the manner that the manufacturer anticipated. See Lugo, 552 N.E.2d at 163; Micallef, 348 N.E.2d at 577. Neither case supports the imposition of liability on a manufacturer of fertilizer products, which are safe when used for their intended purposes but were rendered unsafe by terrorists who substantially altered the products so that they could be used for a violent purpose wholly foreign to their intended purposes.

Because no duty exists under the law of either New Jersey or New York, we find that it was appropriate for the District Court to dismiss the Amended Complaint for failure to state a claim upon which relief could be granted.

F. Proximate Causation

The District Court also properly concluded that, under the law of either jurisdiction, defendants' actions or inactions were not the proximate cause of the World Trade Center bombing.

As the District Court explained, the correct legal framework under New Jersey law is set forth in Zaza:

> Utilization of [the] term [proximate cause] to draw judicial lines beyond which liability will not be extended is fundamentally . . . an instrument of fairness and policy, although the conclusion is frequently expressed in the confusing language of causation, "foreseeability" and "natural and probable consequences." Many years ago a case in this State hit it on the head when it was said that the determination of proximate cause by a court is to be based "upon mixed considerations of logic, common sense, justice, policy and precedent."

Zaza, 675 A.2d at 635 (quoting Caputzal v. Lindsay Co., 222 A.2d 513, 517 (N.J. 1966)).

18

In another case, also cited by the District Court, the New Jersey Supreme Court provided the following guidance:

> A negligent act is not necessarily a substantial factor or proximate cause of an accident simply because it contributed to the occurrence in the sense that absent such an act the accident would not have transpired. Rather, the critical consideration, in the context of multiple factors contributing to the cause of the accident, is whether the faulty act was itself too remotely or insignificantly related to the accident. If it can fairly be regarded as sufficiently remote or insignificant in relation to the eventual accident then, in a legal sense, such fault does not constitute "a cause of the accident, . . . [but] simply presents the condition under which the injury was received, . . .."

Brown v. United States Stove Co., 484 A.2d 1234, 1243 (N.J. 1984) (citations omitted).

In Brown, the court also noted that, with regard to the subsequent alteration of a product, "if the original defect, although not the sole cause of the accident, constituted a contributing or concurrent proximate cause in conjunction with the subsequent alteration, the [original manufacturer] will remain liable." Id. at 1242. Furthermore, "[t]he critical factor in determining whether a subsequent substantial alteration of a product or its misuse can be attributed to a manufacturer as a proximate result of an original design defect under the risk-utility standard is `foreseeability.' " Id. at 1240.

Plaintiff argued below and on appeal that the issue of proximate causation is for a jury to decide. The District Court properly recognized, however, that the court may conclude as a matter of law that defendants' actions were not the proximate cause of the plaintiff's injury. "The issue of responsibility for the highly extraordinary consequence is also a matter of law for the court." Griesenbeck v. Walker, 488 A.2d 1038, 1043 (N.J. Super. Ct. App. Div. 1985); accord Caputzal, 222 A.2d at 518 ("The idea of non-liability for the highly extraordinary consequence as a matter of law for the court has already been recognized in this state."). Furthermore, even if the existence of a duty may not be

19

resolved as a matter of law, it may still be appropriate to decide the issue of proximate causation as a matter of law. See Brown, 484 A.2d 1244 (finding a genuine issue of material fact with respect to the existence of a duty, but granting summary judgment on the issue of proximate cause). The New Jersey courts have on many occasions held that proximate causation did not exist as a matter of law. See Griesenbeck, 488 A.2d at 1043; Jensen v. Schooley's Mountain Inn, Inc., 522 A.2d 1043, 1045 (N.J. Super. Ct. App. Div. 1987); Brown, 484 A.2d at 1244; Caputzal, 222 A.2d at 518.

Similarly, under New York law, a defendant is not held liable for every conceivable consequence that might somehow be causally related to its conduct. See Dyer v. Norstar Bank, N.A., 588 N.Y.S.2d 499, 499 (App. Div. 1992) ("[C]onceivability is not the equivalent of foreseeability."); Van Valkenburgh v. Robinson, 639 N.Y.S.2d 149, 151 (App. Div. 1996) (holding no proximate cause where injury was possible, but not probable, result of negligence). As in New Jersey, courts use proximate cause to draw judicial lines to limit liability. See Ventricelli v. Kinney System Rent a Car, Inc., 383 N.E.2d 1149, 1149 (N.Y. 1978) ("What we do mean by the word `proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point.").

As the District Court recognized, in New York, as in New Jersey, "questions of whether an intervening act severs the chain of causation depend on the foreseeability of the intervening act and should be determined by thefinder of fact." McCarthy, 916 F. Supp. at 372 (citation omitted). "However, in appropriate circumstances, the court may resolve the issue as a matter of law. Those cases generally involve independent intervening acts which operate upon but do not flow from the original act." Id.

We find the decision of the Tenth Circuit in Gaines-Tabb v. ICI Explosives, USA, Inc., 160 F.3d 613 (10th Cir. 1998), to be persuasive on the issue of proximate causation. In that case, the plaintiffs sued the alleged manufacturers of the fertilizer used in the Oklahoma City bombing. The District Court dismissed the complaint for failure to state a claim, and the Tenth Circuit affirmed. Although that case

20

was not decided under New York or New Jersey law, the principles and doctrines applied by the court are similar to those in the instant case. The court noted that causation was generally a question of fact, but that "the question becomes an issue of law when there is no evidence from which a jury could reasonably find the required proximate, causal nexus between the careless act and the resulting injuries." Id. at 620 (citation omitted). Applying the relevant state law, the court wrote:

> [W]e hold that as a matter of law it was not foreseeable to defendants that the [ammonium nitrate] that they distributed to the Mid-Kansas Co-op would be put to such a use as to blow up the Murrah Building. Because the conduct of the bomber or bombers was unforeseeable, independent of the acts of defendants, and adequate by itself to bring about plaintiffs' injuries, the criminal activities of the bomber or bombers acted as the supervening cause of plaintiffs' injuries. Because of the lack of proximate cause, plaintiffs have failed to state a claim for negligence.

Id. at 621.

In the instant case, we similarly hold as a matter of law that the World Trade Center bombing was not a natural or probable consequence of any design defect in defendants' products. In addition, the terrorists' actions were superseding and intervening events breaking the chain of causation. Thus, we find that, under the law of either jurisdiction, the District Court was correct infinding the World Trade Center bombing was not proximately caused by defendants. Rather, it was caused by the terrorists' intentional acts to create an explosive device and to cause the harm to the World Trade Center and its occupants. Therefore, the District Court correctly concluded that plaintiff failed to state a claim upon which relief could be granted.

G. Failure to Warn

The District Court dismissed plaintiff's failure to warn claims on two independent grounds: first, that defendants owed no duty to warn the middlemen; second, that plaintiff is unable to allege facts showing that such a warning would

21

have prevented the harm. We agree with the District Court on both theories.

Plaintiff alleges that defendants owed a duty to warn the distributors, wholesalers, retailers, and other suppliers not to sell the fertilizers to customers without confirming "that buyers in the general and unrestricted public market have legitimate and lawful purposes for use of defendants' products." Essentially, plaintiff's claim is that defendants negligently marketed their products to the general public, not that defendants failed to warn users of the products' dangers.

As the District Court noted, plaintiff cannot point to a single case that supports its theory. The parties have raised the issue of whether the New Jersey Products Liability Act acts as a bar to plaintiff's theory. The NJPLA requires only a warning "that communicates adequate information on the dangers and safe use of the product taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used." N.J.S.A. S 2A:58C-4. Plaintiff argues that, because the NJPLA "is not intended to codify all the issues related to products liability," id. at S 2A:58C-1, there is no statutory bar. Defendants argue that, by requiring only warnings about intended uses, the statute precludes any additional duties to warn. Like the District Court, we see no need to resolve this question because no cases, even under the common law, support the existence of such a duty. The cases cited by plaintiff do not support its existence at all. In the first case, Parks v. Pep Boys, 659 A.2d 471 (N.J. Super. Ct. App. Div. 1995), the plaintiff did not assert a failure to warn claim, nor did it sue the manufacturer at all. The second case, Coffman v. Keene Corp., 628 A.2d 710, 718 (N.J. 1993), only discusses the heeding presumption-- the presumption under New Jersey law that the plaintiff would have "heeded" the warning if the manufacturer had given one. Nothing in the opinion imposes a duty on manufacturers to warn their middlemen. Finally, Macrie v. SDS Biotech Corp., 630 A.2d 805 (N.J. Super. Ct. App. Div. 1993), does not support the existence of such a duty. That case involved the question whether the manufacturer has a duty to warn remote vendees. As the District Court

22

recognized in the instant case, plaintiff is not seeking to hold the defendants liable for failing to warn the terrorists of the dangers of the fertilizer products.

Plaintiff's argument similarly fails under New York law. Plaintiff can cite no case establishing such a duty. The only case cited, Tucci v. Bossert, 385 N.Y.S.2d 328 (App. Div. 1976) is not on point, as there is no allegation that defendants in this case failed to warn the party exposed to the harm -- here, the plaintiff. Furthermore, the suggestion in Tucci that the adequacy of a warning is a jury issue should not be taken to mean that the question of the existence of the duty is a jury issue. As we have seen, the existence of a duty is properly a question for the court.

Thus, plaintiff can cite no authority (and we canfind none) under either New Jersey or New York law which supports the existence of a duty to warn middlemen that consumers, after purchasing their products, may alter the products and harm third parties. The District Court properly dismissed the failure to warn claim on this ground. See also Gaines-Tabb, 160 F.3d at 625 (holding that plaintiffs failed to state a failure to warn claim under Oklahoma law because "defendants had no duty to warn the suppliers of its product of possible criminal misuse").

In addition, we agree with the District Court that plaintiff is unable to allege facts showing that an adequate warning would have prevented the harm. The District Court observed correctly that under both New Jersey and New York law, a plaintiff must show proximate cause in a failure to warn claim. Under New Jersey law, "[i]n a product liability case plaintiff has the burden of proving that the failure to give adequate warnings was a proximate cause of the accident and injuries and that the failure was a substantial factor in bringing about the happening of the accident." Malin v. Union Carbide Corp., 530 A.2d 794, 799 (N.J. App. Div. 1987). "If the basis for recovery under strict liability is inadequacy of warnings or instruction about dangers, then plaintiff would be required to show that an adequate warning or instruction would have prevented the harm." Id. (quoting Campos v. Firestone Tire & Rubber Co., 485 A.2d 305, 311 (N.J. 1984) (quoting Keeton, Products Liability--Inadequacy of Information, 48 Tex. L. Rev. 398,

23

414 (1970))). New York law requires the same showing of proximate cause. See Elsroth, 700 F. Supp. at 166 ("Simply put, this tragedy would have occurred whether or not there had been a warning . . . , and the claim, therefore, must fail.").

Applying this law, we agree with the District Court's reasoned elaboration of why the failure to warn claim must fail:

> In light of the elaborate efforts the terrorists went through to commit their heinous crime, it would defy all logic, common sense, and fairness, the touchstones of proximate causation, to presume that the World Trade Center bombing would have been prevented had Defendants warned their middlemen not to sell to terrorists because terrorists might use the fertilizer to create a bomb. Given the terrorists' obvious determination, the Court cannot presume that even if the middlemen heeded this warning, the terrorists' plan would have been thwarted.

Port Authority of New York & New Jersey, 991 F. Supp. at 410.

Thus, the District Court properly found that plaintiff's failure to warn claim must be dismissed because no reasonable jury could conclude that the crime could have been prevented by defendants' warnings to middlemen that the fertilizer could be criminally misused.

III. Conclusion

For the reasons discussed above, we will affirm the District Court's dismissal of the Amended Complaint for failure to state a claim upon which relief may be granted.

24

Hoeveler, District Judge, Concurring:

I concur in the very well developed opinion of Judge Roth. I am, however, constrained to offer an observation which may bear the fruit of protection from further similar disasters. The precedential value of our decision, as well as that of the Tenth Circuit in Gaines-Tabb v. ICI Explosives, USA, Inc., 160 F.3d 613 (10th Cir. 1998), rests largely on a slender and temporal reed: lack of foreseeability of the intervening criminal act. Whether experience and failure to use available safeguards will, in time, create new legal duties on the part of the manufacturer remains to be seen. We live in a society in which the disgruntled more and more resort to violence. Appellees' products, so easily convertible to dangerous qualities, need not -- with proper treatment -- become a part of that violence.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

25